The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: **April 28, 2026**

**No. A-1-CA-41531**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ELIJAH S. KLUMB,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Emilio Chavez, District Court Judge**

Raúl Torrez, Attorney General
Felicity Strachan, Assistant Solicitor General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Luz C. Valverde, Assistant Appellate Defender
Albuquerque, NM

for Appellant

**OPINION**

**HOUGHTON, Judge.**

{1}    In this appeal, we review Defendant Elijah S. Klumb's convictions for crimes directed at his ex-girlfriend (Victim 1), her new boyfriend (Victim 2), and the house where she lived. Following a jury trial, Defendant was convicted of two counts of aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963); one count of shooting at a dwelling or occupied building, contrary to NMSA 1978, Section 30-3-8(A) (1993); and one count of arson (over $20,000),[1] contrary to NMSA 1978, Section 30-17-5(F) (2006). Defendant argues that his convictions for shooting at a dwelling and aggravated assault constitute double jeopardy and that the district court improperly applied firearm enhancements to his aggravated assault convictions under NMSA 1978, Section 31-18-16(A) (2020, amended 2022). We agree and remand to the district court to vacate Defendant's conviction for shooting at a dwelling, vacate the firearm enhancements applied to Defendant's convictions for aggravated assault with a deadly weapon, and to resentence Defendant consistent with this opinion.

**BACKGROUND**

{2}    Defendant and Victim 1 briefly dated when she lived in Texas. After the relationship ended, Victim 1 moved to a communal house in Taos, New Mexico, and

---

[1]Defendant does not challenge his arson conviction.

began a relationship with Victim 2. Defendant began to randomly visit her at the house and call her unexpectedly.

{3}     On the evening of September 30, 2020, Victims had dinner at the communal house with others, including a witness (Witness). Following dinner, Witness went outside where he saw Defendant walk into a greenhouse that shared a wall and large window with Victim 1's bedroom.

{4}     Witness questioned Defendant about why he was there, but Defendant did not respond, instead glancing between Witness and through Victim 1's bedroom window where Victims were lounging on the bed. Witness yelled, "[Victim 1], Elijah's here," and then left the greenhouse. As Witness rounded the back of the house to retrieve Victim 1, he heard "a very loud crack," which sounded like glass shattering.

{5}     From inside the bedroom, Victim 1 heard Witness call her name followed by a "loud shattering noise." Victim 1 saw a hole in her bedroom window and, although she never saw him, she "realized that it was [Defendant] and he had . . . a gun." Victim 1 estimated that Defendant fired either one or two gunshots into the bedroom.

{6}     Witness immediately returned to the greenhouse where he saw Defendant standing with a gun at his side. As police sirens approached, Defendant exited the greenhouse, tossed Witness a small box containing a wedding ring, and said, "[T]ake care of [Victim 1]." Defendant then fled.

{7} The police performed a protective sweep of the property and instructed the residents to proceed to the police station for interviews. During Witness's interview, the interviewing detective received notice that the communal house was on fire. The fire burned overnight, destroying a significant portion of the house. Investigators determined that the fire originated from a woodpile just below one of Victim 1's bedroom windows. Investigators discovered bottles of hand sanitizer near the wood pile and determined that "the fire was intentionally ignited." Early the next morning, police arrested Defendant in Taos while in possession of a firearm.

{8} Based on these facts, Defendant was charged and convicted of two counts of aggravated assault with a deadly weapon (one count for each Victim), shooting at a dwelling or occupied building, and arson. Defendant's aggravated assault convictions were each enhanced by three years under Section 31-18-16(A) (2020), based on the jury's findings that Defendant committed each count "with the use of a firearm."

**DISCUSSION**

{9} Defendant raises two issues on appeal. First, Defendant argues that his convictions for shooting at a dwelling and aggravated assault with a deadly weapon constitute double jeopardy. Second, Defendant contends that his sentences for aggravated assault were impermissibly enhanced because the 2020 version of Section 31-18-16(A) applied only to offenders who "brandished" a firearm, not those

who merely "used" a firearm as the jury found in this case. The State concedes both issues, acknowledging that "it is likely that this Court will conclude that Defendant's convictions violate double jeopardy" and that "Defendant was improperly sentenced under the 2020 version of the firearm enhancement statute." We appreciate the State's candor and ultimately agree, but we nonetheless engage in an independent analysis of the issues. *See State v. Comitz*, 2019-NMSC-011, ¶ 25, 443 P.3d 1130 (declining to accept the state's concession as to the existence of double jeopardy violations).

## I. Defendant's Convictions Constitute Double Jeopardy

{10} Both the United States Constitution and the New Mexico Constitution explicitly prohibit double jeopardy. *See* U.S. Const. amend. V ("No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."); N.M. Const. art. II, § 15 ("[N]or shall any person be twice put in jeopardy for the same offense."). Encompassed in the proscription of double jeopardy is the right to be free from "multiple punishments for the same offense." *State v. Montoya*, 2013-NMSC-020, ¶ 23, 306 P.3d 426 (internal quotation marks and citation omitted). Defendant's appeal implicates an issue of multiple punishments, which we review de novo. *See State v. Sena*, 2020-NMSC-011, ¶ 43, 470 P.3d 227.

{11} A multiple punishment case may be classified as either a "double-description" case or a "unit-of-prosecution" case. *State v. Silvas*, 2015-NMSC-006, ¶ 8, 343 P.3d

616 (internal quotation marks and citation omitted). The term double-description refers to cases where a defendant's conduct has violated multiple statutes; whereas the term unit-of-prosecution refers to cases where a defendant's conduct has violated a single statute multiple times. *Id.* This is a double-description case.

{12} To analyze a double-description case, we use a two-part test. *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. First, we consider whether Defendant's conduct was unitary; in other words, "whether the same conduct violates both statutes." *See id.* Second, if the conduct was unitary, we "determine whether the [L]egislature intended to create separately punishable offenses." *See id.*

**A. The Conduct Underlying Defendant's Convictions Was Unitary**

{13} "The unitary conduct analysis turns on whether the acts underlying the two offenses are separated by sufficient indicia of distinctness." *State v. Lorenzo*, 2024-NMSC-003, ¶ 6, 545 P.3d 1156 (internal quotation marks and citation omitted). To determine distinctness, we consider "the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury." *Sena*, 2020-NMSC-011, ¶ 46; *accord State v. Begaye*, 2023-NMSC-015, ¶ 20, 533 P.3d 1057 ("The conduct question depends to a large degree on the elements of the charged offenses and the facts presented at trial." (internal quotation marks and citation omitted)). "[I]f it reasonably can be said that the conduct is unitary, then we must conclude that the

conduct was unitary." *State v. Porter*, 2020-NMSC-020, ¶ 12, 476 P.3d 1201 (internal quotation marks and citation omitted).

{14} Defendant argues, and the State concedes, that the conduct underlying Defendant's convictions was unitary. We agree. After reviewing "the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury," *see Sena*, 2020-NMSC-011, ¶ 46, it is clear the State pursued legal theories for both crimes that relied on the same act: shooting into Victim 1's bedroom.

{15} With respect to Defendant's convictions for aggravated assault with a deadly weapon, the State alleged in the criminal information that "[D]efendant did assault or strike at" each Victim. But by trial, the State only pursued the theory of assault by "unlawful act, threat or menacing conduct." *See* UJI 14-305 NMRA. The jury instructions identified that act as "[D]efendant fir[ing] a firearm through the window of a bedroom in which [each Victim] was located." Under that theory, the jury instructions also required the jury to determine whether each Victim feared "[D]efendant was about to intrude on [their] bodily integrity or personal safety by touching or applying force to [each] in a rude, insolent or angry manner" and that the belief was reasonable. There was no testimony that Victims were placed in fear by any other act of Defendant. In fact, Victim 1 testified that she did not realize Defendant was present until hearing the firing of the gun and seeing the hole in her window, which is what caused her fear.

{16} With respect to Defendant's conviction for shooting at a dwelling, neither the charging documents nor the jury instructions identify a specific dwelling or shooting episode. But the testimony and arguments demonstrate that the State's theory was predicated on the same shooting—through Victim 1's bedroom window—that it relied upon for the aggravated assault convictions. In rebuttal closing, the State argued in support of the shooting at a dwelling count that "[D]efendant fired a firearm through the window of his ex-girlfriend's bedroom." The record does not contain evidence about any other shooting on September 30, 2020, and the State does not argue otherwise on appeal.

{17} Thus, there is no "identifiable point in time or intervening event" separating the completion of the aggravated assaults and the shooting at a dwelling: "they were one and the same." *See State v. Torres*, 2018-NMSC-013, ¶ 20, 413 P.3d 467 (finding unitary conduct where the defendant's convictions for shooting at a dwelling and first-degree murder arose from the defendant's singular act of firing nine shots into a bedroom window). Even accepting Victim 1's testimony that Defendant fired two gunshots into her window, the State does not argue that Defendant committed distinct acts. And the record indicates those shots cannot be separated either temporally or qualitatively. Accordingly, we hold that these offenses were predicated on the same act, and were, therefore, unitary.

**B.    The Legislature Did Not Intend Multiple Punishment Here**

{18}    Having determined that Defendant's conduct was unitary, we now must "determine whether the [L]egislature intended to create separately punishable offenses." *See Swafford*, 1991-NMSC-043, ¶ 25. Because neither the aggravated assault with a deadly weapon statute nor the shooting at a dwelling statute expressly permit multiple convictions, *see* §§ 30-3-2(A), -8(A), "we apply [our] canons of construction to determine" whether the Legislature nonetheless intended multiple punishments. *See Torres*, 2018-NMSC-013, ¶ 21.

{19}    We first apply the modified *Blockburger* test because the statutes here are written in the alternative. *See Porter*, 2020-NMSC-020, ¶ 21 (noting that there are "seven distinct ways a defendant may commit aggravated assault," and "four distinct ways a defendant may violate '[s]hooting at a dwelling or occupied building; [s]hooting at or from a motor vehicle'" (quoting § 30-3-8(A), (B)). The modified *Blockburger* test considers not only "whether each statute *in the abstract* requires proof of a fact that the other does not, but also whether the statute, as *applied* by the [s]tate in a given case, overlaps with other criminal statutes so that the accused is being punished twice for the same offense." *Silvas*, 2015-NMSC-006, ¶ 14 (internal quotation marks and citation omitted).

{20}    "The modified *Blockburger* analysis 'demands that we compare the elements of the offense[s], looking at the [s]tate's legal theory of how the statutes were

violated.'" *Begaye*, 2023-NMSC-015, ¶ 24 (quoting *Porter*, 2020-NMSC-020, ¶ 8). To ascertain the State's legal theories, we examine "the statutory language, charging documents, and jury instructions used at trial," and where those resources are ambiguous "we also review testimony, opening arguments, and closing arguments to establish whether the same evidence supported a defendant's convictions under both statutes." *See id.* (internal quotation marks and citations omitted).

{21} In this case, the statutory language, charging documents, and jury instructions alone do not make clear "the State's legal theor[ies] of how the statutes were violated." *See id.* (internal quotation marks and citation omitted). As we noted in the unitary conduct section, neither the charging documents nor the jury instructions identify which dwelling or shooting event the State relied upon for the shooting at a dwelling count. Nor does the statute. *See* § 30-3-8(A). Accordingly, we turn to the State's arguments and the testimony presented at trial to determine whether "the same evidence, that is, the same underlying conduct, is used to support both charges." *See id.* ¶ 28.

{22} To prove aggravated assault with a deadly weapon, under a theory of assault, the State needed to show Defendant intentionally committed an "unlawful act, threat or menacing conduct." *See* UJI 14-305. The jury instructions given in this case reveal that the State elected to fulfill that element by proving "[D]efendant fired a firearm through the window of a bedroom in which [each Victim] was located." Because

aggravated assault with a deadly weapon is a general intent crime, the State needed to show Defendant "intentionally" or "purposely d[id the] act."

{23}     To prove Defendant intentionally, rather than accidentally, "fired a firearm through the window of a bedroom," the State introduced motive evidence showing that Defendant retaliated against Victim 1 for rejecting his attempts to rekindle their relationship. Victim 1 testified that since their break-up, Defendant had become "controlling" and had visited her house and called her phone unexpectedly. The night of the incident, Defendant specifically walked to Victim 1's bedroom. He peered through her window, where she could be seen lounging with Victim 2. After being confronted by Witness, who yelled to Victim 1, Defendant shot through the window of Victim 1's bedroom. Afterward, Defendant tossed a wedding ring to Witness, asking him to take care of Victim 1.

{24}     Implicit in the evidence supporting the State's theory that Defendant *intentionally* "fired a firearm through the window of a bedroom in which [Victims were] located," is the necessary corollary that Defendant knew he was firing into the bedroom where Victim 1 lived.

{25}     As for the shooting at a dwelling count, the jury instructions required the State to show:

1. [D]efendant willfully shot a firearm at a dwelling; [and]

2. [D]efendant knew that the building was a dwelling.

When addressing that count in closing, the State established the first element by arguing that "Defendant fired a firearm through the window of his ex-girlfriend's bedroom." And to establish the second element, the State simply argued, "There's no doubt that this is a home." "Dwelling" was defined by the jury instructions as "any structure, any part of which is customarily used as living quarters." Thus, the "inescapable conclusion" here is that the State relied on the same evidence to prove the unlawful act element of the aggravated assaults, as it relied upon to prove the crime of shooting at a dwelling. *See Silvas*, 2015-NMSC-006, ¶ 21.

{26} This case is indistinguishable from *Begaye*, in which our Supreme Court concluded that the defendant's conviction for breaking and entering was subsumed within his burglary conviction where "the [s]tate used the same exact evidence to support the unauthorized entry element of burglary as it did to support both the breaking of a window and entry without permission elements of breaking and entering." 2023-NMSC-015, ¶ 35 (emphasis omitted). Following the reasoning in *Begaye*, we conclude that Defendant's conviction for shooting at a dwelling is subsumed within his convictions for aggravated assault with a deadly weapon. And when we determine "that one offense is subsumed within the other, the inquiry is over," because the protection against double jeopardy is violated. *See id.* (internal quotation marks and citation omitted).

{27} As a result, one of Defendant's convictions must be vacated. Because all three of Defendant's convictions are fourth-degree felonies, it ordinarily would be within the "sound discretion of the district court" to choose "which conviction to vacate." *See Porter*, 2020-NMSC-020, ¶ 42; *see also* § 30-3-2 (stating that "[w]hoever commits aggravated assault is guilty of a fourth degree felony"); § 30-3-8(A) (stating that "[w]hoever commits shooting at a dwelling or occupied building that does not result in great bodily harm to another person is guilty of a fourth degree felony"). But Defendant's double jeopardy rights can only be protected if either his shooting at a dwelling conviction is vacated or *both* of his aggravated assault convictions are. Recognizing New Mexico's interest in "maximiz[ing] the effect of the jury's verdict and retain[ing] the greatest number of convictions," *see State v. Swick*, 2012-NMSC-018, ¶ 31, 279 P.3d 747 (internal quotation marks and citation omitted), we remand to the district court with instructions to vacate Defendant's conviction for shooting at a dwelling, as it is the only way to maximize the jury's convictions.

**II. The Application of the Firearm Enhancement to Defendant's Aggravated Assault Convictions Was Improper**

{28} The second issue on appeal concerns the application of the firearm enhancement to Defendant's convictions for aggravated assault with a deadly weapon. We first note that we agree with the parties that the 2020 version of the firearm enhancement statute applies to Defendant's conduct. *See* § 31-18-16 (2020). "We have held that the law, at the time of the commission of the offense, is

controlling." *State v. Lucero*, 2007-NMSC-041, ¶ 14, 142 N.M. 102, 163 P.3d 489 (internal quotation marks and citation omitted). The conduct underlying Defendant's convictions was committed on September 30, 2020. The 2020 amendments to the firearm enhancement statute became effective on July 1, 2020, and were not subsequently amended until May 18, 2022. Thus, Section 31-18-16 (2020) controls here.

{29} Defendant argues that his sentences were improperly enhanced because the jury returned special verdict forms indicating that Defendant committed the assaults "with the use of a firearm" and not that he "brandished" a firearm as required by Section 31-18-16(A) (2020). The State concedes that "the requirements of the 2020 version of the firearm enhancement statute were not met, and that Defendant was, therefore improperly sentenced under that statute." We agree.

{30} In *State v. Garrett*, this Court addressed an identical issue. 2026-NMCA-016, ¶¶ 27-31, 584 P.3d 1049. There the district court also enhanced a defendant's sentence for aggravated assault with a deadly weapon pursuant to Section 31-18-16(A) (2020). *Garrett*, 2026-NMCA-016, ¶ 1. As in this case, "the jury found by special interrogatory that a firearm was *used* in the commission of [the] aggravated assault" but "the jury did not make a separate finding of fact that a firearm was *brandished* in the commission of the aggravated assault." *See id.* ¶ 27 (emphasis added) (internal quotation marks and citation omitted). This Court held the firearm

enhancement was improper because "the jury should have been instructed that it had to find that [the d]efendant *brandished* a firearm." *Id.* ¶ 29 (emphasis added) (internal quotation marks and citation omitted). Noting that "[a] district court's sentencing power is derived exclusively from statute," and that such power is "considered part of the district court's subject matter jurisdiction," this Court held that "the district court exceeded its jurisdiction in applying the firearm enhancement." *Id.* ¶¶ 28-29 (alteration, internal quotation marks, and citations omitted).

{31}     Following *Garrett*, we hold that the district court did not have jurisdiction to apply the firearm enhancement to Defendant's aggravated assault convictions.[2] The jury was not instructed and did not return separate findings of fact that Defendant brandished a firearm. The jury's special verdict forms, which indicated only that Defendant *used* a firearm, failed to meet the statutory requirements of Section 31-18-16(A) (2020), and thereby failed to trigger the district court's jurisdiction to

---

[2]We note that our analysis, but not necessarily our result, would differ if *State v. Valencia*, ___-NMSC-___, ___ P.3d ___ (S-1-SC-40141, July 14, 2025), *opinion withdrawn and superseded on reh'g*, ___-NMSC-___, ___ P.3d ___ (S-1-SC-40141, Feb. 16, 2026), had not been withdrawn. In *Valencia*, our Supreme Court held that an identical error in a special verdict form should not be characterized as a jurisdictional error warranting automatic reversal, but rather, as an instructional error requiring application of our traditional "rules and principles of error analysis." *Id.* ¶¶ 54-57.

enhance Defendant's sentence. *See Garrett*, 2026-NMCA-016, ¶¶ 29, 31 ("The term 'brandish' has a different meaning than 'use.'").

**CONCLUSION**

{32}   We reverse and remand with instructions for the district court to (1) vacate Defendant's conviction for shooting at a dwelling or occupied building, (2) vacate the firearm enhancement of Defendant's aggravated assault with a deadly weapon convictions, and (3) resentence Defendant consistent with this opinion.

{33}   **IT IS SO ORDERED.**

_____
**KRISTOPHER N. HOUGHTON, Judge**

**WE CONCUR:**

_____
**ZACHARY A. IVES, Judge**

_____
**JANE B. YOHALEM, Judge**